## WOODRUFF v. PHILLIPS et al.

No. 18817. Opinion Filed Sept. 10, 1929.

Fred E. Suits and C. E. Hall, for plaintiff in error.

George H. Giddings, Sr., and H. L. Stuart, for defendants in error.

BENNETT, C. The parties appear here as they appeared in trial court. J. W. Woodruff sued defendants in district court of Oklahoma county for damages, and his petition may be summarized as follows: That defendants operated for hire a line of taxicabs for passengers and baggage in Oklahoma City and in connection therewith an auto-

land was foreman; that on August 31, 1926, while plaintiff was assisting him, the foreman attempted to drive a frozen bearing off a shaft with a hammer and punch and a particle of steel flew off and struck plaintiff in the left eye destroying the sight thereof; that the usual way to remove a bearing in such case was by a presser, but said machine shop was not equipped with such device; that defendants employed two persons in the shop, but defendants failed to provide compensation insurance under Workmen's Compensation Act.

The acts of negligence alleged are: Failure to furnish safe and proper tools; failure to furnish a safe place in which to work.

Defendants' answer consisted of a general denial, and a denial that they operated a machine shop in which dangerous machinery was used, or that their business was hazardous, or that they came under the Compensation Law. They pleaded contributory negligence; that such injuries as plaintiff sustained were the result of ordinary risks assumed by plaintiff, and incidental to his employment, and such as were obvious to him, and for which defendants were not liable.

The following may be considered a resume of the vital evidence: J. W. Woodruff, plaintiff, 64 years old, employed one year with defendants, who were engaged in checkered cab and baggage business; was employed by Dan Phillips. Defendants' building is about 75x-140 feet. Their cars are stored in front and there was a repair shop about 30x50 feet in rear. They had one-half dozen cabs and same number of trucks. Lindsay Rowland was foreman of shop. Witness worked mostly on small cars, repairing doors or bodies, but helped Rowland when needed. No other regular workers, but once in a great while some of the taxi boys came in and helped fix cars. On the morning of August 31, 1926, Rowland and witness took down a car, found roller bearing worn out and frozen to shaft, and put it on vise, and Rowland hit it with hammer, but it did not come off, and witness told him that he (witness) would get a steel pinch bar, and he went over to bench ten or twelve feet away, and as he turned around at bench Rowland had the shaft on the anvil and he hit it a terrible lick and a particle of metal flew in his eye.

"Q. You don't know in what manner he struck it? A. No, sir; I don't. * * * Q. What kind of a lick did Mr. Rowland give this bearing which caused it to break and fly? A. Why suppose he hit it pretty hard."

The hammer used was a 1½ pound machinist's hammer. Witness had not been called upon before to remove a bearing.

Witness knew the bearing was case-hardened and very brittle. Witness asked Mr. Rowland, "Is that the right way for it to come off?" He said, "It ought to be pressed off, we ain't got nothing to press it off." Later, during the day, witness took two prongs and pulled the other bearings off himself; put a piece of metal behind bearing and screwed it down tight and then put a steel punch against bearing and hit the punch with a hammer. The punch was hard steel. This was on same day, but after plaintiff's injury. Plaintiff has worked in a blacksmith shop, has done wagon repair work, but is not a regular blacksmith. There was no defect in hammer, punch or anvil. Sliver must have come from piece of metal that was hammered. No cars except defendants' were repaired at shop.

Walter Spears, witness for plaintiff, has been a mechanic for eight years; the usual way to remove bearings from shafts is by pressing them off; that it is not safe to hammer them off; that the steel is likely to chip off; that witness does not know how these bearings are removed in taxicab repair shops; he has never been around any taxicab repair shop and does not know how they do it, that this particular work is out of his line as he is engaged principally in Ford repairs.

Cross-examination:

"Q. There isn't any pressing machine on earth that you know of that could do that work? A. I think I could press it off. Q. Tell me if there is a machine in this town in a machine shop that could do that work in any way except to take a hammer and knock it off. Tell us one. A. I can't tell any particular place because I don't know anything about what the other shops use and I never visited them. Q. You don't know anything about it, do you? A. Not the other men's shops. * * * Q. If you took it down there (to the Ford shop) you couldn't work in that shop. A. We would figure out some way of getting it off without hammering it. * * * Q. You never saw a man take a hammer and knock on a thing like that in your life, did you? A. Yes, sir; lots of times. * * * Q. Tell the jury where you have seen that done? A. Any shop. * * * Q. You can't tell us any shop that it isn't done that way? A. I think if you would visit some of these other shops, large shops, you would find they have some kind of press to get that off with."

C. E. Walls: Is a mechanic and runs a filling station, garage and machine shop. Says that he has to have certain kind of equipment to handle certain kinds of cars and that such equipment is very expensive. This witness explains that where the bearing is not

galded or stuck, it can be removed by a press.

"Mr. Stuart: We want what is the usual and customary way. A. That is just every machinist. I will say the safer way is to take a torch and just heat that— * * * Q. State whether or not it is ever usual and customary to hammer them off? A. Very few you see done that way. * * * Q. It is dangerous to undertake to remove bearings by hammering them off? A. Very dangerous, treacherous. * * * Q. Is that a rather unusually large shaft and bearing? A. Not so much unusually large as this is long and it takes an awful big gear puller to get that. * * * Q. Would you encounter any difficulty if you had the right kind of a puller in pulling the gearing off? A. Very seldom we do have. They are not pressed on so terribly tight, and if they are stuck, there is only one way out, and that is the torch, and you can't get away from that, and there is only one way out if you get stuck without hitting it."

He says that it is customary for chips of steel to fly in any shop.

"Q. You talk about using an acetylene torch. Don't you know there are three accidents caused by an acetylene torch to one of anything else? A. No, sir. Q. Don't you know it is dangerous? A. It is dangerous but not 3 to 1 with anything else. * * * Q. Now, have you got a machine at your place of business that will pull that off? A. Not that particular one. * * * Sometimes we fail on pulling them off if they are stuck or galded on the shaft."

A. E. Clark, mechanic: Operates Clark's garage; does general repair work; the usual and customary way of removing bearings from crank shafts is to press them off where they have the equipment. Asked why they are not hammered off, says that it might not be quite safe on account of flying particles and that it might damage the shaft, but he says that if you hit any piece of iron, something is liable to fly off of it and this is known by people of average intelligence. The witness examined the exhibit in the case and says that it is a rather mean job, and that he would use a blow torch and hit it.

Cross-examination:

"Q. A presser wouldn't work that, would it? A. No, it wouldn't. Q. A presser wouldn't do that at all, would it? A. No."

Witness further indicates that if that job were brought to his shop, he would not accept it at all; that to use the blow torch would mean to damage the gear shaft.

"Q. So, your pressing machine wouldn't help out at all, would it? A. No, sir. Q. Do you know of any pressing machine that would work that? A. The way that is constructed, I don't believe he could do it."

Witness has seen them use hammers on such jobs.

"Q. Do you know of any pressing machine that would help out? A. Not on this particular one. * * * Q. If you used a blow torch, you would hurt the pinion? A. Yes, sir; it would take the temper out."

He indicates that he knows no way of removing that bearing save by a torch.

"Q. Look at that one there, and if that is correct, tell us if you know where we can get a puller or a presser that would relieve us of that situation if that was fastened or frozen on there. We have got to take our cab like it was. A. I don't know right now that I could put my hands on a puller for that. If you would scour all of the supply houses, they might carry them, but it seems the machinists or builders of different mechanical appliances are always trying to keep up with this kind of stuff, to make a machine to answer every purpose."

Lindsay Rowland, witness for defendants: Worked in defendants' shop; there is no foreman, only two employees in shop; plaintiff was not under his orders, but always helped him when needed; the bearing was frozen to shaft and next to pinion. He means by "frozen" that it was so tightly stuck that it would not be got off. Plaintiff was ten or twelve feet away when he was struck in the eye by sliver and was not helping witness at all, but had helped him to remove shaft from differential. He knew of no other way to get bearing off than by use of hammer and punch. Knows of no instrument that would remove this bearing and had no presser that would pull it off; knows of none in town; that he has been doing this work ten or twelve years; never knew a man to get hurt before in this way; that he removed bearing in usual and customary way; has used a presser, but cannot use presser on a bearing such as this; it sets too close to pinion; has never seen a puller that would do the work on this particular shaft; has never seen one or known of one that would remove the bearing like this one; did not know that sliver broke off while he was trying to hammer it; knows no reason why plaintiff was at the bench; was not helping witness; plaintiff was not closer to him than the bench; that plaitniff did not hold shaft for him; he held it himself. There are no pullers or pressers in the shop; did not do a general repair business, but simply worked on Phillips' cars; never saw a torch used in removing bearings; that plaintiff made some prongs to fit over the bearing which was on inside of housing and pulled that one out, that was not up against the pinion like the one in question.

D. M. Phillips, witness for defendants:

Have been running this business since 1899; have a little repair shop in back end of business house for own use in taking off old parts and putting in new ones. If any serious break occurs, or anything needs welding, it is sent to regular machine shop; do not attempt any difficult work and no public work at all; have had some little experience as a mechanic. Robert Phillips looks after the repair shop and Mr. Rowland; there is no other car made like checkered taxicab, not even yellow cab, and there is no presser that is made to take the bearing off, and the only way to remove it is with a punch and hammer, except with a torch, and this will destroy temper of shaft. We inquired of checkered people by letter concerning removal of these bearings. This letter indicates that it is in answer to an inquiry as to removing No. 435 from differential pinion shaft No. 8733. The letter says that they did not do much of their repairing, but that when they did do it, their mechanic used a hammer and punch. It indicates further that Columbia Axle Company advised that they are equipped with a hand press with special toggle for performing this operation, and the letter continues, "but of course they are a large manufacturer, and can afford to install high priced equipment. It would not be practical for the cab operators to invest the amount of money that would be necessary to buy the special equipment for this one operation." Witness says that they have been unable to find any press that would take off the bearing in question; has been around in the machine shops here among those who make a specialty of selling, but has been able to find nothing; witness has known plaintiff for 50 years.

A. W. Klein, Lester A. Dye, Jack Collins, J. R. Eagin, Barr Prest, and R. I. Phillips are owners of, or mechanics in, auto shops, and all testify that they know of no presser or puller that would remove the bearing in question; that it can only be, and usually is, removed by hammer and punch; that the only alternative is the torch which is dangerous to operate and destroys the temper of the shaft.

At the conclusion of the evidence defendants requested the court to instruct the jury to return a verdict for defendants, which motion was sustained with exceptions, and from which action of court plaintiff appeals.

Was this action of the court error? From all the proof, it must be entirely clear that this shop, owned and operated by defendants, was designed only to take care of minor repairs to their own cars; that they did no public work and did no repairs for any other individual or concern; that they operated half dozen small cabs and about the same number of trucks for hauling passengers and their luggage in and about the city. It is apparent that they did not intend to operate a shop, thoroughly equipped, to take care of even all such repairs as might become necessary to their own vehicles. They were accustomed to doing their minor repairs, but the larger repairs were given attention by regular machine shops to whom defendants entrusted their cars for this purpose. The plaintiff's case must depend upon whether or not the defendants were negligent in not furnishing some sort of equipment by the use of which the bearing in question, which had become frozen to the shaft, might have been safely removed, and without injury to the plaintiff. It is not contended that there was any defect in the equipment actually furnished. The machinist's hammer appears to have been without defect, either in size, quality or mechanism. There is no effort or evidence to show that the anvil was not fitted for all the purposes for which it was intended. The chisel was, so far as the proof goes, in good condition. It is not entirely clear whether the sliver which injured plaintiff flew from one of these simple implements or from the equally simple bearing, for all were of highly tempered metal. But we think that is immaterial here.

The hammer is perhaps the simplest of all tools, closely followed by the anvil, which has been known in its present shape, size and material since ancient times. Even simpler, if possible, is the punch, which is nothing more than a piece of very hard steel sharpened at one end, much in the form of a chisel. So far as we can learn from the record, this bearing was also of simple construction, and all of these implements were of necessity of highly tempered steel. We think it should be and is of universal knowledge, even among the uninitiated, that where two pieces of hard metal are brought in sudden and forcible contact, in the nature of things, there will fly off slivers to a more or less extent, dependent upon the quality and temper of the metal and the force of the stroke. This is no more curious than the flying out of its position of a nail under the impact of a hammer, which we have all seen since childhood, or the flying of chips from the blows of a club-ax upon dry timber. It is a matter of common observation in blacksmith shops to see slivers fly from the heated iron under the blows of the smithie's hammer. Can it be said that a man of mature years, who had worked in a blacksmith shop, who had been making repairs upon wagons and vehicles, and who, for a year or a year and a half, had been engaged in the repair of automobiles, would not un-

derstand this? The evidence is uncontradicted that this particular kind of repair did not often becomes necessary. The evidence is likewise clear that these defendants had had work of that kind done by other and better equipped repair men of the city upon at least three occasions.

Were defendants negligent in failing to foresee that a repair of this particular kind would become necessary, and, foreseeing it, install equipment, even if such equipment were usual in larger machine shops, when, as appears from the evidence, it was the design and purpose of defendants simply to equip their shop with such convenient, simple and inexpensive tools as would be sufficient for ordinary and casual repairs, and that larger repair work should be sent to better equipped establishments?

The evidence is clear that at the time this sliver flew into plaintiff's eye, he was not holding the shaft, but was standing some ten or twelve or more feet away, at a bench where he had gone to get some tool which he had suggested might be used in the operation, and as he turned the sliver struck his eye. There is nothing in the evidence to show what direction he was from the anvil, nor in what direction the hammering was done, whether towards or away from plaintiff, even if that were important. If, as a matter of fact, the tools that were furnished for the repair work were, in themselves, without defect and reasonably suitable for the purpose for which they were used and intended to be used, and where the occasion for the use of other or more expensive or complex apparatus was so seldom, as it is shown to be in this case, can it be said that failure of defendants to have the vision to foresee and provide against that eventuality is negligence? As a matter of common knowledge, machinists have different equipment, different mechanics have different methods, and different farmers have different equipment for the operation of their farms, and the fact that they differ one from another, it seems to us, is hardly sufficient to say that the fact of such difference tends to establish negligence. One man buys and furnishes to his employee a Cadillac, another a Franklin, and still others Fords; some buy new cars and others buy those which have been used, dependent largely upon the judgment, taste and ability of the purchaser. It could not be contended by the man who had used the Ford that, if he had been furnished with a Cadillac, an accident would have been avoided, and that, therefore, his employer was responsible. Again, it would seem that the action of Rowland, who chose to use a hammer and punch in removing a frozen bearing from a shaft, without asking for more tools or without suggesting that the job be sent to a better equipped shop for attention, was a mere detail of the operation of which the master knew nothing and could know nothing and for which he should not be responsible. E. Van Winkle G. & M. Co. v. Brooks, 29 Okla. 351, 116 Pac. 908; Miller v. Centralia Pulp Co. (Wis.) 113 N. W. 945; O'Connell v. Thompson Starrett, 72 App. Div. 47, 76 N. Y. Supp. 296; Labatt on Master and Servant, vol. 4, pp. 4540, 41; Maher v. McGrath, 58 N. J. L. 469, 33 Atl. 945.

In the case of C., R. I. & P. Ry. Co. v. Lillard, 42 Okla. 109, 141 Pac. 8, the plaintiff was injured by hammering a bit into a socket when a sliver of metal flew off of either the bit or the socket and put out the plaintiff's eye. The court said:

"It resulted from the act on the part of the plaintiff in tapping the bit into the socket, an act just as simple, it seems to us, as putting an ordinary auger bit into a brace, and we must hold, therefore, that the act in which plaintiff, under his own testimony, received the injury comes clearly within the well-settled rule as to the degree of care required of the master in the use of simple tools and appliances. * * *"

And the court, in the first paragraph of the syllabus, uses the following language:

"When the appliance or machinery furnished employees is at all complicated in character or construction, the employer is charged with the duty of making such reasonable inspection as is necessary to detect defects; but the master is under no duty to inspect simple or common tools, or to discover or remedy defects arising necessarily from the ordinary use of such instruments."

This case quotes with approval from Longpre v. Big Blackfoot Milling Co., 38 Mont. 99, 99 Pac. 131, which holds:

"The master is not required to inspect simple appliances, such as hammers, saws, spades, etc. * * * A tool of this class is so simple in its construction and so well understood by men of ordinary intelligence that it would seem absurd to say that the master should make a careful inspection of it before he commits it to the hands of his servant, who has the same capacity to understand its character and uses that he himself has. * * *"

An array of authorities is set out in the Lillard Case, and, among others, Wachsmuth v. Shaw Electric Crane Co., 118 Mich. 275, 76 N. W. 497, wherein it is held:

"In heavy or complicated machinery, and where the person called upon to use the appliance may not possess the skill to detect unfitness, or the opportunities to do so, the

law may require diligence upon the part of the master; but where the appliance is a common tool, of which the man who uses it is necessarily well qualified to judge, * * * when he uses it, has an opportunity to know its condition, a distinction may be made, and the master may rely upon the servant to inform him of the defect, or not use the tool if it is unsafe." (Citing 1 Labatt on Master and Servant, sec. 161; Rawley v. Colliau, 90 Mich. 31, 51 N. W. 350; Kehoe v. Allen, 92 Mich. 464, 52 N. W. 740, 31 Am. St. Rep. 608; Miller v. Railroad Co., 21 App. Div. 45, 47 N. Y. Supp. 285; Marsh v. Chickering, 101 N. Y. 396, 5 N. E. 56):

The same doctrine is announced in St. L. & S. F. R. R. Co. v. Mayne, 36 Okla. 48, 127 Pac. 474, and in the opinion the court quotes from the case of Martin v. Highland Park Mfg. Co., 128 N. C. 264, 38 S. E. 876, where a servant was injured by a piece of metal flying from a hammer which he was using in driving an iron key into a shaft. In this case the master was held not liable, and the court, in the opinion, said:

"Surely, it cannot be seriously contended that every employer is responsible for injuries occurring from improperly tempered axes, hoes, scythes, trace chains, lap links, bridle-bits, etc., the imperfections of which could not be known till used, or for defective whiffle-trees, axe-helves, hoe-helves, hand-spikes, plow-lines, and such like (the defects of which would be first discovered by the party using them), unless the employer is shown to have had knowledge of such defects. If such be the rule of law, then the contentment of the farmer must give place to anxiety and dread lest injury, resulting to a servant from a splintered hoe-helve or hand-spike, defective bridle-bit, whiffle-tree or plow-line, et id simele, may at any time occur, and sweep from his farm and belonging in compensation of the damage done. To the same experience would the contractor expect to be subjected, should a defective nail, while being driven by one of his carpenters, break and do injury. To such doctrine we cannot subscribe."

In the case of Gillaspie v. United Iron Works, 76 Kan. 70, 90 Pac. 760, a set or snap used to receive blows of a sledge in riveting eyebeams was considered and treated as an ordinary or simple tool, and it was held that an employee injured from a flying sliver from the tool was not entitled to recover for the danger was as apparent and as much within the comprehension of the employee as the master. Many cases are referred to in the Mayne Case, supra, to like effect. The seventh and eighth paragraphs of the syllabus in the case of Smith v. United Fuel Gas Co. (W. Va.) 112 S. E. 205, are as follows:

"The danger incident to the use of a cold chisel and hammer, in the setting of metal nuts on bolts, is an obvious and ordinary risk assumed by an adult servant, even though he lacks experience in the particular work done with such implements and provision might have been made by the master, for the performance thereof in such manner as would have obviated necessity for the use of the chisel and hammer.

"In an action by a servant against his master for damages for the loss of an eye, occasioned by a steel sliver flying from a nut, as an incident of an effort by the former to set the nut with a cold chisel and hammer, under the circumstances above indicated, the trial court, if requested so to do, should direct a verdict for the defendants."

In the case of Phoenix Printing Co. v. Durham, 32 Okla. 575, 122 Pac. 708, the court makes it clear that while, under section 6, art. 23, of the Constitution, contributory negligence and assumption of risk are questions of fact to be submitted to the jury, this section does not apply to the primary negligence because of which a recovery is sought, and where there is no evidence reasonably tending to show defendant is guilty of negligence, it is error for the trial court to submit the issue to the jury. Among other things, the court, in the opinion, says:

"A master has some discretion concerning the kind of machinery which he will use. He may use new or old machinery as he likes. He may use an old pattern or a new one as he pleases, provided the machinery which he uses is sound and performs the work which it was designed to do, and mere proof that he is using machinery of a certain kind, and that an accident happens in the use of it, does not tend to show negligence, unless it is coupled with some evidence—not mere speculation—that it is not properly performing its function. * * * It is not the master's duty to furnish safe, but sound machinery. Such a rule would destroy all manufacturing, because no machinery is safe. The master's duty to exercise reasonable care to furnish his employees a safe place within which to work does not mean that he must furnish safe machinery according to the opinion of the court or jury, but that he must keep the appliances and places which he does furnish in a reasonably safe condition."

The case last cited follows closely the doctrine in Solts v. Southwestern Cotton Oil Co., 28 Okla. 706, 115 Pac. 776.

In the case of C., R. I & P. Ry. Co. v. Duran, 38 Okla. 719, 134 Pac. 876, Judge Williams, for the court, in discussing a case

where the plaintiff received an injury to his eye from a piece of flint which flew from his pick, uses the following illustration:

"It would be just as reasonable to claim that the owner of the barn who had employed the carpenter to cover the same was liable on account of the accidental flying of the nail from the way the hammer struck it, thereby causing an injury to the eye of the carpenter, as it is to claim that the railway company is liable in this instance. Likewise it would be as reasonable to claim that the farmer who had hired one to chop wood or clear away timber in order to put the land in cultivation was liable on account of the accidental hitting of the eye by the flying chip. * * * The uncontradicted evidence shows that the plaintiff was injured as a result of an accident which was incident to the hazard of his employment. Dewey Portland Cement Co. v. Blunt, supra."

The most recent case in our court is that of C., R. I. & P. Ry. Co. v. Spillane, 130 Okla. 46, 265 Pac. 130, wherein plaintiff received an injury to his eye by a bit of steel from a hammer and chisel. The court said:

"With the common knowledge that when steel hits steel chips will fly and that their flight cannot be controlled, it occurs to us that it would be absurd to hold that this evidence establishes the fact that the defendant Nichols was carelessly and negligently driving the chips towards plaintiff."

Plaintiff cites many cases which we have examined, and finally concludes with the statement that he has found a case on "all-fours" with the case at bar, and directs our attention to Republic Iron & Steel Co. v. Ohler (Ind.) 68 N. E. 901. The facts in that case are so dissimilar to the facts in the case at bar that we cannot concede that it is even persuasive, much less controlling. In that case the common laborer was ordered to hold in place a large bar of heated steel while the end of it was being hammered with sledges by other employees. His head was not more than two feet from the bar; he was inexperienced in that line of business and had been continuously at work without rest or sleep for 48 hours, and at the end of about 36 hours, he had notified the master that he was unable longer to endure the strain. The court based its opinion upon two propositions: The first, that he was inexperienced, and this clearly appears; and, second, that the employee was not in such condition as to appreciate his danger and properly exercise his faculties for self-protection. The latter ground was in itself sufficient. 18 R. C. L. p. 602—citing Great Northern R. Co. v. Couture, 14 Quebec K. B. 316, 7 Ann. Cas. 190 and note;

Furlow v. United Oil Mills, 104 Ark. 489, 149 S. W. 69. Plaintiff argues that defendants failed to warn him. The breach of this duty was not contained in the petition. It might also be answered from the words of the court in the Ohler Case, supra:

"Of course, the duty to warn and instruct in such cases naturally arises out of the ignorance or inexperience of the employee, and does not extend to employees who are of mature age, and familiar with the employment in which they engage and the risks incident thereto." (Citing Atlas Engine Works v. Randall, 100 Ind. 293, and other cases.)

Plaintiff's petition and proofs are addressed to the proposition that defendants' negligence arose from failure to have on hand a presser and that such failure rendered the place unsafe. In a legal sense, this had nothing to do with an unsafe place. Of course, every place where an accident occurs is, to an extent, an unsafe place, but it is not an unsafe place within the meaning of the law which entitles an employe to a safe place in which to perform his labors. E. Van Winkle Gin & Machine Co. v. Brooks, 29 Okla. 351, 116 Pac. 908; Hermann v. Port Blakeley Mill Co., 71 Fed. 853; Butler v. Townsend, 126 N. Y. 105, 26 N. E. 1017.

It is clear that whatever danger there was arose from hammering a punch against metal and this danger, much or little, varied according to the uses to which these implements were put. The slivers would have flown as dangerously in one place as another. The court, in the case of Ruemeli-Braun Co. v. Cahill, 14 Okla. 422, 79 Pac. 260, says:

"It is true that the place where Cahill was doing the work was not absolutely safe, because the ladder fell and he was hurt; neither is one who is engaged in painting a church steeple, or the upper stories of a high building from a swinging scaffold working in a safe place; but if there are no hidden or unusual dangers, the workman has a safe place within the meaning of the law, and the dangers in such case are only those which he contracted to assume. Martin v. A. T. & S. F. R. R., supra (166 U. S. 399, 17 Sup. Ct. 603, 41 L. Ed. 1051)."

What then, if anything, was defendants' primary negligence? It must have been the failure to furnish the presser, for, under the above authorities, the claim of unsafe place disappears. What is the proof as to the presser? Plaintiff introduced three mechanics as witnesses, one of whom said outright that neither the presser, nor any other device of which he had knowledge, would re-

move the bearing in question. Another said that he did not know whether or not cab and repair shops here had a device which would perform the service, but that he thought he could figure out a way to avoid using the punch and hammer (without indicating the process), and the last one testified that he had often seen the hammer and punch used in various shops for such purpose, but the only safe way was by the use of the acetylene torch, which, he admitted, would destroy the temper of the shaft and was distinctly dangerous to employees using same.

There is no substantial proof that there was in Oklahoma City a presser that would remove this bearing, nor is there proof that such presser was a part of the usual equipment of shops of the size and pretensions of that operated by defendants.

Under the restricted allegations of negligence relied on, the authorities cited and reasons given dispose of the case, but even if the allegations of negligence were made comprehensive, still, in the light of the proof, it seems we would be forced to the same conclusion that there is no sufficient evidence of primary negligence of defendants to support a verdict for plaintiff.

Every farm carries a few simple tools with which to make its ordinary repairs. It is known generally that almost every vehicle carries a kit of tools for making minor repairs and adjustments. To adopt the rule contended for by plaintiff would put the prudent man who equipped his farm, shop or vehicle with ordinary tools to make casual repairs or adjustments in order to avert disaster, at a distinct disadvantage as against the man who took no such precautions. The result would make employees less careful for their own safety and compel the employer to accept one of two bad alternatives: either to equip, regardless of expense, every farm, shop and vehicle so as to meet every exigency, or to furnish no equipment whatever. This situation would be intolerable, and not, as we think, within the contemplation of the law.

At the conclusion of the evidence plaintiff asked leave to amend his petition to conform to the proof and show that defendants were in the transfer and storage business. This was within the sound discretion of the trial judge. From our examination of the record we cannot say that he abused his discretion.

Plaintiff further contended that defendants were engaged in hazardous occupation and came under the provisions of Workmen's Compensation Law. The court ruled against the plaintiff, and we find no reversible error therein.

Upon consideration of all the evidence favorable to plaintiff, we hold there is no sufficient evidence to reasonably sustain a verdict in his favor. For the reasons given, the judgment of the trial court is affirmed.

LEACH, HERR, DIFFENDAFFER, and TEEHEE, Commissioners, concur.

By the Court: It is so ordered.