**PETROLEUM CHEMICAL CORP. et al. v. STATE INDUSTRIAL COM. et al.**

No. 22403. Opinion Filed Dec. 1, 1931.

Rehearing Denied Jan. 12, 1932.

Abernathy & Howell, for petitioners.

Fred A. Graybill, for respondent.

ANDREWS, J. This is an original proceeding in this court to review an award of the State Industrial Commission in favor of the claimant therein, respondent herein, against the petitioners herein. The State Industrial Commission found:

"(1) That claimant, on and prior to March 24, 1930, was in the employment of this respondent and engaged in a hazardous occupation covered by and subject to the provisions of the Workmen's Compensation Law.

"(2) Arising out of and in the course of his said employment, claimant on March 24, 1930, sustained an accidental personal injury, as a result of which he was temporarily totally disabled from June 21, 1930, to November 1, 1930;

"(3) As a further result of said injury claimant suffered the loss of the left leg by amputation;

"(4) That the average wage of claimant at the time of said injury was $200 per month"

—and made an award based on those findings.

The petitioners present two propositions as follows:

"The claimant's employment was not such an employment as would bring him within the purview of the Workmen's Compensation Act."

"The claimant at the time of his injury was not engaged in the course of his employment, nor did his injury arise out of or in the course of such employment."

The petitioners assert that the burden is upon the claimant to establish the fact that he is in a class embraced within the provisions of the Workmen's Compensation Act, and that nothing can be presumed or inferred in this respect. In support thereof they cite the decision of this court in Hamilton v. Randall, 136 Okla. 170, 276 P. 705. The decision cited does not sustain that contention. It holds only that the burden is upon a claimant to prove that the relationship of employer and employee existed at the time of the injury. When the relationship of employer and employee has been shown, there is a presumption that the claim is within the provisions of the Workmen's Compensation Act. Bishop v. Wilson, 147 Okla. 224, 296 P. 438. In that case it was held:

"Under the Workmen's Compensation Act (paragraph 1 of section 7295, C. O. S. 1921), providing that there shall be a presumption that a claim comes within the provisions of the act in the absence of substantial evidence to the contrary, the Industrial Commission must presume that the business conducted by the employer was within the provisions of the act defining 'hazardous employments' in the absence of such substantial evidence."

The record shows that the claimant at the time of the injury was an employee of the petitioner and that he was acting at that time under the direction of his superior. We are not concerned with the nature of his duties at some other time and we are considering his duties and his occupation at the time of his injury. With reference thereto the petitioner showed by evidence

that the claimant was employed as "assistant engineer" under one Liddell, the "chief engineer"; that on the night of the injury a fire occurred so close to the plant of the petitioner as 'to endanger the property of the petitioner; that the chief engineer directed the claimant "with two other pipe fitters to make some temporary connections at the alcohol plant itself to permit the use of one of our plant lines at that time leading to and conducting material from the plant to about 1,500 feet away from the plant"; and that the injury occurred while the claimant was so engaged in the protection of. his employer's property. With reference thereto the chief engineer testified:

"A. This tank fire occurred about 12:15 a. m., on March 24th, at which time I was at home. The blowing of the fire siren took me down to the plant. I did no active work in the fighting of the fire, but confined my operations to the removal of the light butene fraction in the storage tank about 250 feet from the scene of the fire, which belonged to the Chemical Petroleum Corporation. The removal of this material from this location consisted of laying considerable two-inch pipe line, strung on the ground. On completion of this line, Thomas and several men were delegated to watch the burning of this material. This burning commenced, as I remember it about 6 o'clock in the morning and continued until about two o'clock in the afternoon, at which time all of this hazardous material was removed. Q. What orders did you give Mr. Thomas, at this time, if any? A. We had a consultation at the scene of the fire and agreed that this light material should be removed from the scene. I delegated Thomas with two other pipe fitters to make some temporary connections at the alcohol plant itself to permit the use of one of our plant lines at that time leading to and conducting material from the plant to about 1,500 feet away from the plant. He organized the pipe fitting on the line but did no actual pipe fitting. He was superintending the fitting of the pipe, getting the pipe from the storage and fitting it, and, so on. Q. Then you ordered Mr. Thomas to superintend the laying of the line in order to remove this material belonging to the Chemical Petroleum Corporation from the scene of the fire? A. Yes, sir. Q. Was this within the line of his employment under ordinary conditions? A. Not under ordinary conditions"
—and:

"Q. Mr. Liddell, do you recall whether or not Mr. Thomas made any complaint this particular night of an injury, which he claims to have sustained at that time? A. Yes. sir. Q. What report did he make to you of that injury? A. He stated that he had stumbled and I am not sure whether he actually fell or not, but he fell over some of the lines in the plant and stated he hurt his foot, his foot was bruised and was pain-

ing him. Q. What did you advise him to do at that time? A. I asked him how serious it was and he thought it was simply bruised and I asked him if he thought he could carry on with us at that time, and he believed he could and he stayed with us during the course of that fire. Q. Did he return to work the next day? A. Yes, sir; as I remember, he did. Q. Did he work for some little period after this injury? A. Yes, sir. Q. Do you recall approximately what length of time he worked after he sustained —after this particular night? A. I don't recall exactly. I believe it was about ten or fourteen days. Q. On this particular night, did you call out Mr. Thomas or was he on duty at that time, carrying out his employment as a draughtsman or did he respond voluntarily to the fire? A. He responded voluntarily. He was on the job a couple of minutes before I was. Q. He was under no duty to—by reason of any express order from the company to report to such fire? A. No, sir. Q. His work in supervising of the laying of this pipe line was entirely foreign to his employment, was it now? A. Yes, except in an emergency case, it was."

The claimant "carried on" in an emergency at the direction of his superior in order to protect the property of his employer from danger of loss by fire. He was injured while superintending the "getting the pipe from the storage and fitting it, and so on." That the chief engineer was authorized to direct the operations is shown by the testimony of the resident manager, as follows:

"A. I was awakened about 2:30 in the morning by an explosion or the fire whistle. I saw that there was a fire at the refinery, and went over to the plant. The fire was in a large tank about a hundred feet from a Petroleum Chemical Corporation tank containing raw material from which the alcohol was produced. There was a conference between Mr. Oakley of the Barnsdall Company, Mr. Liddell, myself, and it was decided that this tank containing raw material was dangerous and should be pumped out. Mr. Thomas then supervised the laying of a temporary pipe line in order that tank might be emptied. I recall seeing Mr. Thomas supervising the laying of the line, but do not recall the giving of any orders to Mr. Thomas concerning the laying of the pipe line. Q. Was the supervising of this line a part of his duties as contemplated by his employment ordinarily at this time? A. This was not a part of his regular duties. Q. Did the Petroleum Chemical Corporation have a regular fire department organized at this plant at this time? A. No. Q. When a fire occurred, what were the orders of the company to the employees actions in case of fire? A. I do not know any definite orders ever being issued covering employees actions in case of fire."

—and:

"Q. Then, on this particular night it

just happened that Mr. Thomas, as well as yourself, and certain other workmen of the Petroleum Chemical Corporation responded to the fire call voluntarily? A. Yes. Q. Do you recall Mr. Thomas on this particular night complaining of having injured his foot while supervising the laying of this line? A. I don't recall definitely, but he either complained that night or next day. Q. His work in supervising the laying of this pipe line was entirely foreign to his usual employment at this time was it now? A. Yes."

While it may have "just happened" that the claimant responded to the fire call, he was not injured while attending the fire as a spectator; he was injured while performing hazardous services at the direction of his superior. The petitioners cite Board of Commissioners v. Grimes, 75 Okla. 219, 182 P. 897, Woodruff v. Phillips, 138 Okla. 77, 280 P. 449, Oklahoma-Arkansas Tel. Co. v. Fries, 128 Okla. 295, 262 P. 1062, and Southwestern Grocery Co. v. State Industrial Commission, 85 Okla. 248, 205 P. 929. We do not consider those cases as in conflict with the rule herein announced. In Associated Employers' Reciprocal v. State Industrial Commission, 82 Okla. 229, 200 P. 174, it was said:

"The substance of the contention is that it was none of the duties of the claimant under his employment to fight fire. A casual statement of the contention demonstrates the absurdity of the contention. While it is true he was not employed to fight fire, it is obvious that he would be an unworthy servant if he stood idly by and watched his employer's property destroyed by fire without making any effort to protect it."

In the instant case the record shows that the claimant was directed by his superior to perform the services in which he was engaged at the time of his injury.

While there is some testimony to the effect that the claimant was suffering with Buerger's disease at the time of the injury and that his physical condition is due to the disease rather than to the injury, there is ample evidence to sustain the award of the State Industrial Commission under the rule stated by this court in Employers' Liability Assurance Corp. v. Coffman, 147 Okla. 227, 296 P. 395, wherein it was held:

"Where claimant was performing manual labor in a hazardous employment and sustained an injury in the course of such employment, resulting in temporary total disability, held, he is entitled to recover compensation during the continuance of such disability; further held, the fact that such employee had prior to such injury a disease such as did not impair him from performing labor, which disease was aggravated and accelerated by the injury, the presence of such disease will not prevent the injured employee from recovering compensation for

the entire time of his disability and until such time as it can be definitely determined that the disability caused by such injury has ceased."

The testimony of Dr. John W. Riley, an eminent physician and surgeon, is to the effect that in his opinion the claimant at the time of the injury "had Buerger's disease" and that he had had it "for several years previously." He testified:

"Q. Doctor, with reference to this injury about which he advised you, I will ask you whether or not in your opinion that kind of an amputation and the manifestations thereafter would have any effect upon the Buerger's disease which he had at that time, and if so, what? A. It would have no effect upon the Buerger's disease per se, but an injury might be a precipitating cause to start the Buerger's disease, so that gangrene and amputation would be necessary. Q. You mean that it would have no effect upon the Buerger's disease, but that it might—an injury of that kind might start gangrene? A. Yes. Q. Why would it start gangrene? A. Because it would."

In a medical report filed by the petitioner, Dr. Riley said:

"Brown, Allen, and Mahorner, in their book 'Thrombo-Angiitis Obliterans,' published by W. B. Saunders Company, 1928, on pages 140 and 141, has the following to say in relation of trauma to initiation of gangrene in Buergers disease; Every effort should be made to protect the extremities from trauma, since mild abrasions from falling boards and tools frequently initiate gangrene. 'Corns' should not be trimmed except by chiropodists who understand the vascular condition and corn plasters should not be applied. The use of strong irritating ointments or tinctures must be avoided. Slight abrasions must be carefully treated by covering with sterile vaseline under a light sterile bandage. Minor surgical procedures, such as removal of tonsils, incisions of the toes, and injections into veins of the feet have played an important part in the initiation of gangrene, since these procedures were casual in more than 30 per cent. of all cases of gangrene. These meddlesome measures cannot be too strongly condemned in the presence of arterial sufficiency."

The record shows competent testimony reasonably tending to support the award of the State Industrial Commission, and that award is in all things affirmed.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. CULLISON, J., absent.